United States District Court
Southern District of Texas
FILED

AUG 1 0 2000

Michael N. Milby, Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ARTHUR GOCHMAN<br>& MOLLY GOCHMAN | § § § | CIVIL ACTION NO.-00-126<br>JURY |
| vs. | § § | |
| STANLEY A. STARRETT, JR.,<br>KEN OAKLEY, URBAN ENGINEERING, A<br>PARTNERSHIP, THE PERALLA<br>CORPORATION, URBAN CONSULTING<br>ENGINEERING, INC.<br>AND THE CITY OF PORT ARANSAS, | § § § § § § § | |

## PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT
## OF DEFENDANTS, URBAN ENGINEERING,
## URBAN ENGINEERING CONSULTANTS, INC., JAMES URBAN,
## AND PERALLA CORPORATION

MAX J. LUTHER III, P.C. & ASSOCIATES
MAX J. LUTHER III
Texas Bar Number 12706000
Federal I.D. No. 298
1350 Frost Bank Plaza
802 North Carancahua,
Corpus Christi, Texas 78470-0165
Telephone: 361/888-5544
Telecopy: 361/887-6835

DOW, COGBURN & FRIEDMAN, PC
Edmund L. Cogburn
Texas Bar Number 04501000
Federal I.D. No. 2105
9 Greenway Plaza, Suite 2300
Houston, Texas 77046
Telephone: 713/940-6012
Telecopier: 713/940-6099

ATTORNEYS FOR PLAINTIFFS
ARTHUR GOCHMAN AND MOLLY GOCHMAN

# PLAINTIFFS' EXHIBITS

**EXHIBIT**                                                                                                    **PAGE**

A.   Deed of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.   Lease  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

C.   Beachwalk Unit II Residential Dune Permit and Beachfront Construction
     Certificate  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 14

D.   Selected Pages from Deposition of James Urban (July 14, 2000)  . . . . . . . . . . . . 2, 3, 17

E.   Coastal Management Plan  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

F.   Selected  Pages from Deposition of Stanley A. Starrett, Jr. (December 14, 1999)  . . . 2, 3

G.   Selected Pages from Deposition of Steven Thompson (December 3, 1999)  . . . . . . . . . 3

H.   Selected Pages from Deposition of Greg Turicchi (July 14, 2000)  . . . . . . . . . . . . . . . 3

I.   Deed - Beachwalk II  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

J.   Selected Pages from Deposition of Molly Gochman (June 8, 2000)  . . . . . . . . . . . . . 10

K.   Minutes of Planning & Zoning Commission; Regular Meeting 11/24/97-
     Port Aransas  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

L.   Transcript of Excerpt from Audiotape Entitled P&Z Regular Meeting-
     7/28/97; Tape 1 of 1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

M.   Affidavit of Dr. Jennifer Prouty  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

N.   Selected Pages of General Land Office Regulations  . . . . . . . . . . . . . . . . . . . . . . . . . 17

O.   Permit Applications  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

O:\100\100026\0190\ExhibitsUr.msj\080920001902

# TABLE OF AUTHORITIES

## FEDERAL CASES

PAGE

*Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Greene v. Lindsey*, 456 U.S. 444 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983) . . . . . . . . . . . . . . . . . . . . . . 20

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306,314 (1950) . . . . . . . . . . . . . . . . 20

*Owens v. Bd. of Regents of Tex. S. Univ.*, 953 F.Supp. 781, 790 (S.D. Tex. 1996) . . . . . . . . . 18

*Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . 18

*Schroeder v. City of New York*, 371 U.S. 208 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Walker v. Hutchinson*, 352 U.S. 112 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## STATE CASES

*Bayouth v. Lion Oil Co.*, 671 S.W. 2d 867, 868 (Tex. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Broun v. Texas & N.O.R. Co.*, 295 S.W. 670,674-675
(Tex.App.-Beaumont 1927 reh'g den.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*City of Corpus Christi v. Davis*, S.W.2d 640, 646
(Tex.App.-Austin 1981, writ ref'd n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Massey v. Armco Steel Co.*, 652 S.W.2d 932,934 (Tex. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 18

*State ex rel. Pan Am Production Co. v. Texas City*, 303 S.W.2d 780, 784 (Tex. 1957) . . . . . . . 7

*Tennessee Gas Transmission Co. v. Fromme*, 269 S.W.2d 336, 337 (Tex. 1954) . . . . . . . . . . . 4

*Waco v. City of McGregor*, 523 S.W.2d 649, 653 (Tex. 1975) . . . . . . . . . . . . . . . . . . . . . . . . 7

## FEDERAL STATUTES

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4,7, 11, 13, 17, 23

42 U.S.C.A. § 1983 (West 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

U.S. Const. amend. XIV, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## STATE STATUTES

*Tex. Nat. Res. Code Ann.* § 61.001.4 (West 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Tex. Nat. Res. Code* § 63.151 (West 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 16, 19, 20

*Tex. Nat. Res. Code* § 63.011 through 63.152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Tex. Nat. Res. Code Ann.* § 63.001.1-8 (West 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Tex. Nat. Res. Code Ann.* § 61.001.6 (West 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Tex. Nat. Res. Code* § 63.057 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATE REGULATIONS

General Land Office Regulations § 15.4(d) and (f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

O:\100\100026\0190\TOAur.msj\080920001902

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ARTHUR GOCHMAN | § | CIVIL ACTION NO.-00-126 |
| & MOLLY GOCHMAN | § | JURY |
| | § | |
| vs. | § | |
| | § | |
| STANLEY A. STARRETT, JR., | § | |
| KEN OAKLEY, URBAN ENGINEERING, A | § | |
| PARTNERSHIP, THE PERALLA | § | |
| CORPORATION, URBAN CONSULTING | § | |
| ENGINEERING, INC. | § | |
| AND THE CITY OF PORT ARANSAS, | § | |

## PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS, URBAN ENGINEERING, URBAN ENGINEERING CONSULTANTS, INC., JAMES URBAN, AND PERALLA CORPORATION

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiffs, ARTHUR GOCHMAN & MOLLY GOCHMAN (hereinafter referred to as "Gochman"), respond to the "Brief" (apparently the Motion for Summary Judgment of Urban Engineering) by corresponding paragraph numbers. The Movants will be referred to as "Urban."

### I. REVIEW OF SUMMARY OF ARGUMENT

The use of terms such as "spite" are not totally appropriate in a summary judgment argument, which is, after all, one dealing with the legal aspects of the case. Accordingly, we will try to confine ourselves to those aspects.

Molly Gochman ("Molly") is the owner of Lot 24, Beachwalk Subdivision in Port Aransas, Texas. Lot 24 was purchased by Molly, not given to her, and she has paid for both the Lot and the construction of the home on it, which is her home. (Ex. A) Arthur

Gochman ("Arthur"), her father, has a sublease interest in and to the home. (Ex. B) Urban's Motion identifies "attachment '1,'" as providing the "general orientation of the property." The only Attachment 1" we have located is the Beachwalk II Residential Permit. (Ex. C) This does not provide information about any subdivision except Beachwalk II. Oakley owns lot 35, located in Beachwalk II. Lot 35 is contiguous to Lot 24, Molly's home. (Ex. D)

As stated in the second paragraph, Starrett, the developer, hired Urban to provide engineering services for both Beachwalk and Beachwalk II, preparing applications for Dune Permits to allow dune impairment on "various lots," including Oakley's. The Brief is disingenuous in failing to note that the Coastal Management Plan of the City of Port Aransas (the "Plan"), the basic guide and substantive blueprint for the Dune Permit process was prepared by Urban. (Ex. E) Thus, Urban, in preparing applications "to allow for construction activities" has connived with Starrett, the developer, to engage in destruction of the Dune, using its expertise and reputation garnered from Urban's position as City Engineer and from the drafting of the Plan, against the interests of the environment along the beach. Starrett testified that Urban was his engineer in connection with Beachwalk Subdivision, as well as Beachwalk II. (Ex. F) Randy Thompson, another private engineer who purportedly acted as City Engineer from time to time, was also on Starrett's payroll, as Starrett testified. (Ex. F) It appears that the Dune Permits were purportedly issued by the City Council of Port Aransas, by vote at Regular Meetings of the City Council. Minutes, There were, however, no public hearings held by the City Council in connection with such Dune Permits, contrary to the provisions of the Dune Protection Act. All of the meetings

of the City Council are "open," based on the provisions of the "Open Meetings Act," which requires public notice and access.

Contrary to the statement of the Brief, Molly did <u>not</u> build in the middle of Lot 24 based on "misinterpretation of the Beachwalk I Dune Permit." There <u>is no Dune Permit</u> with respect to Lot 24, the location of Molly's house. As a result, there is no Dune Permit to "misinterpret." Certainly, Arthur was surprised (nonplused?) to find the Oakley residence in front of their house, which they had expected would not take place, because of the location of the critical dune.

As to the claims of Plaintiffs in this suit, there are misstatements in the Brief. First of all, we re-allege conspiracy to deprive Arthur and Molly of their constitutional property rights. We have not claimed that it was "vast." The conspiracy alleged is a conspiracy pursuant to 42 U.S.C. 1983. Starrett testified that Urban was the City Engineer who inspected Beachwalk. (Ex. F) Steve Thompson, the building official who conducted the investigation of "Gochmans' complaint," testified upon deposition that Urban was acting as a City Engineer in connection with the Beachwalk II Dune Permit. (Ex. G) In Jim Urban's own deposition, he was ambiguous as to whether he has notified the City of Port Aransas that he was not acting as City Engineer on the Dune Permit. (Ex. D) Turricci, Oakley's contractor, testified that he dealt with Urban as City Engineer in building Oakley's house. (Ex. H)

## II. SUMMARY JUDGMENT MOTION AND EVIDENCE

The documents attached to the Brief are not challenged, so far as they go. As they are used in the argument of Urban, Plaintiffs point out some discrepancies.

Page 3

## III. ALLEGED GROUNDS FOR SUMMARY JUDGMENT

1.    **Plaintiffs' claims are Not Barred by the Statute of Limitation**.

Plaintiffs' Claim for Injury under 42 U.S.C. 1983 is, admittedly, subject to a two-year statute of limitations.  There is no basis, however, for a claim that the statute began to run on the date the Dune Permit was issued.  At that time, the status quo had not been altered, the dune was unimpaired and there was no basis for a suit by Plaintiffs against anyone.  In fact, Plaintiffs were totally unaware of the issuance of a Permit, issued involving a subdivision to which they had no interest or knowledge until construction began.   The Oakley construction began in February of 1999.  (Ex. H)  Until Plaintiffs' property rights as littoral owners were violated by actual damage to the dune, authorized by the Dune Permit, they had no cause of action and  therefore, the statute of limitations would not run against them until the dune was actually attacked and mutilated by Oakley.  It is well-settled that an action for permanent damage to land accrues, for limitation purposes, upon discovery of the first actionable injury to the land.  *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex. 1984); *Tennessee Gas Transmission Co. v. Fromme*, 269 S.W.2d 336, 337 (Tex. 1954).


2.    **Plaintiffs' Section 1983 Civil Conspiracy are Well-Taken.**

Urban cannot negate the conspiracy claims.

a.    **Section 1983 Claim.**

Plaintiffs held a protected property interest in the Dune based on their being "littoral owners."  Under the Dune Protection Act, the State of Texas recognized that littoral owners have an interest in the protection of the Dune and have a right to appeal to the Courts from the action of the City Council to protect those rights.  Tex. Nat. Res. Code §

Page 4

63.151  Urban was "acting under color of law" as the "City Engineer," the author of the Plan

of  and through Jim Urban, as the undisputed local authority on the Dune Protection Act.

**b.    Civil Conspiracy.**

We submit civil conspiracy has been shown, and that Urban participated.

**c.    Evidence of Civil Conspiracy.**

By use of its position as City Engineer of the City of Port Aransas, Urban was

able to, improperly, procure the Dune Permits for Starrett so that Oakley could invade the

Dune to Molly's damage.  Plaintiffs have standing to bring their claims under the Dune

Protection Act.   In truth and in fact, Arthur and Molly are littoral owners.   There is a

statement in the Brief, at page 5, referring to a description on page 5 of attachment "L" to

the Brief.  Attachment L, contrary to the statement on page 5, is not a deed from Arthur

Gochman.  Arthur Gochman did not deed any land to the City of Port Aransas.  (The deed

is from Starrett to the City.)  (Ex. I)  The deed reserves an easement to the beach for the

benefit of Starrett's "successors and assigns."  As set out further, Arthur and Molly are

littoral owners and do have standing to bring claims under the Act, as well as under the

Civil Rights Act.

### Plaintiffs Have Standing As Littoral Owners

The owner of property near, but not touching, the shore, as Plaintiff are, is a littoral

owner under the Dune Protection Act.   Moreover, the easement to the beach Starrett

retained across Lot 67, next to the beach, in the deed from Starrett to the City, of

Beachwalk, Lot 67, also effected an additional basis for the littoral status of Plaintiffs as

Lot Owners in Beachwalk.

## Argument and Authority On Littoral Ownership

"'Littoral Owner' means the owner of land adjacent to the shore and includes a lessee, licensee, or anyone acting under the littoral owner's authority." Tex. Nat. Res. Code Ann. § 61.001.4 (West 1999).

To be a "littoral owner," the subject property must be adjacent to the shore. The term 'adjacent' has been interpreted by Texas law as commonly meaning "in the vicinity of and not necessarily contiguous or touching upon," depending on the context of the particular situation.

Pursuant to Section 63.151 of the Texas Natural Resources Code, "littoral owners" have the right to appeal local governing body decisions made under the Dune Protection Act, sections 63.011 through 63.152 of the Texas Natural Resources Code. In the case at hand, Defendants Urban Engineering, City of Port Aransas, and Ken and Andrea Oakley ("Defendants") have claimed that Plaintiffs, Arthur and Molly Gochman ("Plaintiffs"), are not littoral owners because the property in question, Lot 24 (the "Property"), does not abut the Gulf.

With the statutory definition, the relevant authority supports the meaning of "adjacent" as "nearby". Black's Law Dictionary defines the word 'adjacent' as, "[l]ying near or close to; sometimes, contiguous; neighboring. *Adjacent* implies that the two objects are not widely separated, though they may not actually touch" BLACK'S LAW DICTIONARY 38 (5th ed. 1979). In line with this, the Texas Supreme Court has stated that, "[t]he term 'adjacent' is not a word of fixed or definite meaning. The authorities are almost unanimous in according to that term the meaning of 'neighboring or close by' or 'in the vicinity of and not necessarily contiguous or touching upon.'" *State ex rel. Pan Am. Production Co. v. Texas*

Page 6

*City*, 303 S.W.2d 780, 784 (Tex. 1957); *see also Broun v. Texas & N.O.R. Co.*, 295 S.W. 670, 674-675 (Tex. App.-Beaumont 1927, reh'g den.) (discussing the meaning of 'adjacent' and finding that "near" and "across the street" satisfy adjacency requirements). With this in mind, the same Court has further stated that, "[a]djacency is a question of law which must be determined in the context of the facts of each particular case." *Waco v. City of McGregor*, 523 S.W.2d 649, 653 (Tex. 1975); *see also Broun*, at 674 (stating that 'adjacent' is a relative and not definite or absolute term). Thus from this the word 'adjacent' generally means "in the vicinity of," but is subject to considerations of the particular situation.

With respect to the stated general understanding of the word 'adjacent,' the Property (and also lots 25 and 26) is adjacent to the Gulf, and hence is littoral property. The only tract of land separating the Property from the Gulf is the beachfront tract, Lot 67 ("BW"), which Plaintiffs conveyed to the city for public use. The Property enjoys a view of and easy access to the Gulf. It is as close to the water as any private property in the area and near the shore could possibly be. For these reasons, it is effectively beachfront property, neighboring, close by, in the vicinity of and thus *adjacent* to the shore, and should accordingly be treated as littoral property.

The same result follows when considering the particular circumstances of the statute. The Dune Protection Act's principal purpose is to protect those properties or persons that may be adversely affected by the erosion and destabilization of Gulf Coast dunes. Tex. Nat. Res. Code Ann. § 63.001.1-8 (West 1999). Accordingly, section 63.151 (allowing littoral owners to appeal municipal decisions concerning the dunes) of the Act acknowledges that certain properties or persons close to the shore are especially vulnerable to dune erosion by giving them a special voice for appeal. The true test,

Page 7

therefore, for determining whether a certain property is littoral for purposes of this Act, is whether or not the property especially relies on dune support and stability. In the case at hand, the Property certainly stands to greatly suffer upon any change in the structure of the nearby shoreline. Because of this, the policy driving the Dune Protection Act requires that the Property be categorized as littoral.

Backing this claim is the language of the recently amended section of the statute defining "littoral owner." In 1991 the legislature enlarged the definition of littoral owner to include *lessees or licensees* of the land adjacent to the shore. Tex. Nat. Res. Code Ann. § 61.001.6 (West 1999). This backs the policy claim in the previous paragraph, further stressing the special interests of those individuals who stand to suffer from any change in the nearby dunes.

In addition to Plaintiffs' obvious littoral interest in the Property based on the general policy and definitions discussed above, Plaintiffs' position is further strengthened by their easement over the property between BW and the beach owned by the city, Lot 67, which Defendants agree is littoral property. Plaintiffs, therefore, have an easement interest in land that is not disputed, which supports their ownership of littoral property. If we consider this easement interest along with the revised wording of the statute, Plaintiffs have a greater interest than a "license" or "lease" (both temporary interests) in the undisputedly littoral property, it follows that, because of this, they must be considered to be littoral owners. Furthermore, coupling Plaintiffs ownership in the Property with their easement across the beachfront, Plaintiffs stand to materially suffer from any change in the dune structure, and should therefore, in line with state policy and as littoral owners, be given the right to appeal governmental decisions concerning the dunes.

Page 8

In response to Plaintiffs claim as littoral owners, Defendants argue that Plaintiffs should not be considered littoral owners because the Property does not abut the Gulf. Defendants cite the definition of "littoral rights" in Black's Law Dictionary and one case backing this claim. Defendants have, however, improperly interpreted their sources. The statutory definition would certainly control the Black's Law Dictionary definition of Littoral Rights as "Rights concerning properties abutting an ocean, sea or lake rather than a river or stream (riparian). Littoral rights are usually concerned with the use and enjoyment of the shore." BLACK'S LAW DICTIONARY 842 (5th ed. 1979). If the inquiry were about "littoral rights" as BLACK defines them, the Property might have to "abut" the Gulf, although with the easement appurtenant to it the Property does "abut" the Gulf. Defendants argue for a definition contrary to the Code definition, which just is not the law.

Similarly, Defendants cannot rely on the case they have cited, *City of Corpus Christi v. Davis*, 622 S.W.2d 640, 646 (Tex. App.-Austin 1981, writ ref'd n.r.e.), a case decided long before the enactment of the Dune Protection Act, and certainly not purporting to construe it.

### Conclusion

Plaintiffs are littoral owners. The Property's proximity and material connection to the dunes ("nearby" and "in the vicinity") along with the easement across the beachfront satisfy both the letter of the Act and the policy behind it.

### IV. SUMMARY JUDGMENT FACTS

1.      The Brief accurately states that Starrett developed Beachwalk and Beachwalk II in Port Aransas, Texas. Urban was hired by Starrett to provide engineering services,

including application for dune permits in connection with the development of these two subdivisions. This is undisputed.

2.    It is undisputed that Arthur and Molly were the purchasers of three lots from Starrett, Lots 24, 25, and 26 in Beachwalk Subdivision, with Molly building on Lot 24. Arthur owns Lots 25 and 26 and has a leasehold interest in Lot 24. Oakley purchased Lot 35, Beachwalk II, from Starrett.

3.    Starrett, under #97-010 (the "Permit") purportedly obtained permission from the City of Port Aransas to allow for cutting into the Critical Dune which was located on both of the home sites of Oakley and Molly. Molly built her home on Lot 24, locating it as she did because, being a person of environmental concern, she had no desire or wish to damage a critical dune. (Ex. J) Oakley had no such impediment.

4.    The Planning and Zoning Commission of the City of Port Aransas (the "Commission") replacing the beachfront advisory committee contemplated by the Interlocal Agreement, acted to recommend approval to the City on November 24, 1997 at a regular meeting. (Ex. K) There was no public hearing on the Permit before the Commission. The City of Port Aransas purportedly approved the Permit on December 18, 1997 at its regular City Council meeting. There was no public hearing on the Permit before the City Council. The Permit itself, signed by the Mayor on behalf of the City Council, purports to be issued on November 24, 1997. (Ex. C) This is a bit reminiscent of Alice in Wonderland, and the Red Queen:

First the verdict, then the trial.

Page 10

5.      Finally, as noted above, the Permit was approved before the Land Office and the Attorney General received any notice of it, making their comments superfluous. Indeed, they did not "recommend" approval.

6.      Apparently, Stephen Thompson, the Building Official for the City of Port Aransas inspected Oakley's construction, and found no variation from the purported Dune Permit #97-010.

7.      Plaintiffs have no quarrel with the dates listed at #7 on page 9.

## V. ARGUMENT AND AUTHORITIES

Arthur and Molly, bring their conspiracy claims under 42 U.S.C. 1983.  The question of "impartial tribunal" has been discussed above and Plaintiffs certainly do claim that they did not have the benefit of an "impartial tribunal."  Further, Plaintiffs' rights were ignored by the denial of notice and hearing.

Section 1983 certainly supports the claims of Plaintiffs against Urban in this cause.

## A.    The Summary Judgment Standard

Summary judgment is proper in any case where there is no genuine issue of material fact and that movant is entitled to judgment as a matter of law.  Plaintiffs have no quarrel with the statement of the law set out at V.A of the Brief.

## B.    The Statute of Limitations

None of the authorities cited by Urban on page 11 of the Brief supports Urban's position that the statute of limitations began to run when the purported permit was voted through by the Council on December 18, 1997.  The correct statement of the law is contained in the sentence:

> The two-year statute begins to run at each invasion of a plaintiff's interest causing loss and damage in a conspiracy case.

There was no damage to the dune until Oakley acted upon the purported Dune Permit.  The statute of limitations did not begin to run until Oakley invaded the Dune.  See discussion at III.1, above, and authority cited

## C.    The State Law Conspiracy Claim

### 1.    The Elements

The statement of law under this heading at page 12 of the Brief is not challenged by Plaintiffs.

### 2.    Urban was acting as City Engineer

The issue developed by Urban in its Brief is whether or not Urban was "working for Mr. Starrett and not acting as City Engineer. . ."  What really happened was is that Urban was acting as <u>both</u> City Engineer <u>and</u> on behalf of Starrett.  To refute this contention, the Brief, at page 13, cites a statement made to the Commission from a transcription of excerpts from audio tapes of the Commission meetings, specifically the meeting of July 28, 1997 (Ex. L), a hearing on the preliminary plat approval of Beachwalk II.

Interestingly enough, James Urban begins with recognizing that he is doing "something we haven't done in the past. . ." and he wants to "make sure everybody realizes is that, as you know <u>I act for the City as a City Engineer</u>.  In the past, Tom has asked me to notify the City I'm acting on behalf of Mr. Starrett.  Randy Thompson is acting as y'all's engineer (inaudible)."  (Ex. L)  This is noteworthy for several reasons.

First of all, James Urban concedes that, normally speaking, Urban acts for the City as City Engineer.  Secondly, Tom (the City Manager) has asked him, he says, to notify the

City when he is acting on behalf of Mr. Starrett. Finally he states Randy Thompson is "acting" as "y'all's engineer." What is also notable, however, is that this meeting dealt only with the preliminary plat approval on Beachwalk II. It did not deal with Dune Protection Permits and, in fact, the Commission is charged, in dealing with Dune Protection Permits, substantially differently than it is in dealing with plat requests, which are handled under the zoning laws, not under the Coastal Management Plan.

There is no citation to any transcript of meetings or discussions on Dune Protection Permits whereby Urban has notified the City that he is acting only behalf of Mr. Starrett and not on behalf of the City. While lawyers may be more attuned to such ethical considerations from bitter experience, Urban obviously realized that it was conflicted at that point. The average layperson would not normally understand it unless it was at least called to his attention as a serious question. It should have been pointed out to all members of the Board or Council called upon to act in a situation where Urban appeared to be acting on behalf of both parties. Apparently, the City claims that Randy Thompson took over the duties of the City Engineer in place of Urban with respect to all of the Starrett filings. Urban and the City have produced many documents in response to requests for production of documents relevant to this transaction. No documents have been produced reflecting Randy Thompson's involvement as City Engineer in connection with Starrett's Dune Permit Applications. As noted above, Randy Thompson himself was on Starrett's payroll in connection with the original Beachwalk Subdivision.

Starrett testified Urban was acting as City Engineer in inspecting Beachwalk, and even Thompson, the Building Official, testified that Urban was acting as City Engineer with

Page 13

respect to the Dune Permits. Turricci, Oakley's contractor, testified that Urban was the City

Engineer that Turricci deal with. The evidence is far from conclusive with respect to Urban.

      **3.     The permitting process requires approval by the Commission and City Council.**

      This section of the Brief claims:

> Before the City Council took even one vote to approve the Permit, the Permit Application had been reviewed by both the Texas General Land Office and the State Attorney General's Office.

As noted above, that may not be true, since the Permit itself reflects that it was issued and

approved by the City Council on November 24, 1997, <u>before anything had been forwarded</u>

to the Texas General Land Office and the State Attorney General's Office. (Ex. C)  The

General Land Office and the Attorney General's Office are not "approval" reviews.  The

purpose of those reviews is to seek their "comments."  DPA, CMP, GLO Regs.  Presumably

with or without adverse comments, the City could approve a Dune Permit.  Such being the

case, the action by the Attorney General and the General Land Office is not conclusive as

to the validity of the Dune Permit.

      Contrary to Urban's argument at page 15 of the Brief, it is not "hard to imagine" what

kind of substantive impact Urban's blessing would have on the approval process when it

is first considered that the Plan itself was prepared by Urban.  Urban "wrote the book."

What could be a greater authority?  Presumably, the City Council is in need of technical

professional advice with respect to this kind of permitting process.  Otherwise, it has no

way to evaluate statements in the Application, forcing it to take them at face value every

time they are presented.  Without technical assistance to the City Council, presumably by

the City Engineer, the Dune Permit process is simply a ritual  of form allegations and form

approvals with no substance. In this case, the process appears to have been just that. No alternative to cutting into the Critical Dune was presented in the Application and none was considered by the City Council based on the Minutes and also the transcript audio tapes of the meeting in which the Dune Permit was approved. Likewise, the City did not comply with the constitutional requirements of notice and hearing to persons with property rights such as littoral owners.

In its brief, the City falls back on the Open Meetings Act as the basis of its claim of notice and hearing.

First of all, there was no "public hearing." The audio tapes do not reflect one and the Minutes do not reflect one. They were ordinary meetings of the City Council conducting City business and which these were approved. The public hearing required by the Dune Protection Act did not occur and there was no notice of the nonhearing. Further, if property rights to be affected, it is required that personal notice be given reasonably expected to bring a matter to the attention of the notified party, at least by first class mail. This of course, was not done. Constitutionally, personal notice is required regardless of what the statutes set out. It is clear that Arthur and Molly had rights as littoral owners to challenge the action of the City on the Dune Permits. It is equally clear that they were prevented from exercising those rights by the failure of the City to give them personal notice.

### 5.     There was no impartial tribunal

As a tribunal, the Commission and the Council acted unlawfully, because they were not impartial. The heart of the conspiracy is that Urban, the City, and Starrett conspired to deny Arthur and Molly the right to an impartial tribunal. Legally and equitably, Arthur and Molly were entitled to a Commission and City Council approaching permits affecting

Plaintiffs without bias against them.  With Urban acting as City Engineer on their behalf, and, thus, by approving the permit for Starrett, the City denied Arthur and Molly of an impartial tribunal, denying them the equal protection of the laws.  Clients of Urban, therefore, were placed in a privileged status vis-a-vis the law with 99% certitude that any application involving the Plan, drafted by Urban, would be approved by the Commission and the City Council as recommended by Urban, their City Engineer.  This is not one "equal playing field" that all claimants desire when they present their claims to a tribunal.

**6.      Approval of the Permit Damaged Arthur and Molly.**

The Plan and the Interlocal Agreement contemplate two stages of dealing with dune permits.  First, the Commission (or "beachfront advisory committee"), and second, the Council.  The General Land Office and the State Attorney General's Office were presented with Commission approval of the Permit, upon which they had only marginal comment.  They did not "recommend approval."  The important factor here is the proper consideration of the steps required in approving the Dune Protection Permit.  The City did not properly follow those steps and it appears very strongly that they omitted such because of their reliance on the judgment and knowledge of Urban as their City Engineer.  Damages that Arthur and Molly have received have resulted from the violation of a Critical Dune, contrary to the Dune Protection Act, the Plan, and the regulations of the General Land Office.  The dune was and is part of the Critical Dune Complex on the beach which crosses their property.  They are, thus, at greater risk from  erosion and flood damage.  The affidavit of Dr. Jennifer Prouty, demonstrates the adverse effects on the critical dune and material weakening of the dune.  (Ex. M)

The Plan (Ex. E), the Dune Protection Act , and the General Land Office Regulations (Ex. N) all require that there be alternatives presented to cutting into the Critical Dune before such destruction is approved. (Ex. E)  Otherwise, the applicant must prove there is no practicable alternative which would have no adverse effect on the critical dune or its vegetation. See Plan, IV. F. 1. , GLO Regs., Section 15.4 (d) and (f), Tex. Nat. Res, Code, Section 63.057.  No alternatives were presented by Starrett and the file of Urban with respect to this project reveals no such alternatives that were considered, even by Starrett. (Ex. O) No proof was submitted that there was no practicable alternative.  (Ex. D)  An important segment of all three statements of dune protection rules has been ignored in the approval of these Permits.

## D.    The Section 1983 Claims

Where an individual has been deprived of a constitutionally protected right through actions under color of law, that individual may have a civil rights claim under 42 U.S.C. § 1983.  The relevant authorities reflect the propriety of Plaintiffs" claims:

### Discussion

### Elements of § 1983 Conspiracy

42 U.S.C. § 1983 states,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C.A. § 1983 (West 1994).

Interpreting conspiracy claims under this statute, the Fifth Circuit has held that "[i]n order to prevail on a section 1983 conspiracy claim, a plaintiff must establish (1) the

Page 17

existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Pfannstiel v. City of Marion,* 918 F.2d 1178, 1187 (5th Cir. 1990). Where the alleged conspiracy involves both private and public actors, the same Court has held that, "[a] private party may be held liable under § 1983 if he or she is a 'willful participant in joint activity with the State or its agents.'" *Cinel v. Connick,* 15 F.3d 1338, 1343 (5th. Cir. 1994) *citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970). Furthermore, with respect to a government official's possible claim of qualified immunity, the Fifth Circuit has held that upon establishing that a constitutional right has been violated, the court must "decide whether the defendant's conduct was objectively reasonable in light of the legal rules clearly established at the time of the incident." *Owens v. Bd. of Regents of Tex. S. Univ.,* 953 F.Supp. 781, 790 (S.D.Tex. 1996). Only if the official's conduct was not objectively reasonable can the court then consider the 1983 conspiracy charge. *Owens,* at 791; *Pfannstiel,* at 1187. When considering the conspiracy charge, a federal court will look to state law, where the Texas Supreme Court has defined civil conspiracy as follows:

> An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.

*Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex. 1983).

Thus, in conclusion, a federal court confronted with a section 1983 conspiracy charge involving both public and private individuals must decide:

(1)     whether the government officials' conduct in question was objectively reasonable;

Page 18

(2)     whether plaintiff was deprived of any Constitutionally protected rights as a result or in furtherance of such conduct;

(3)     whether defendants had a "meeting of the minds on the object or course of action," with an unlawful means to a lawful end or with a lawful means to an unlawful end.

Section 1983 Civil Rights Violations

In the case at hand, Plaintiffs allege that they have been deprived of their rights to property, due process, and equal protection, as a result of combined governmental and private actions. With respect to property, the construction of the Oakley house within the protected dune area has materially damaged the Gochman property and rendered the Gochman house more vulnerable to damage in the case of erosion, storms or severe weather. With respect to due process, because the Gochmans are littoral owners, Section 63.151 of the Dune Protection Act gives them the right to appeal any governmental decision issuing a permit to build on protected dune areas. The Port Aransas Planning and Zoning Committee issued a permit to build the Oakley house without proper notice to the Gochmans, and anyone else similarly adversely affected, and thus deprived them of their due process right to appeal the decision as littoral owners. With respect to equal protection, when the Planning and Zoning Committee approved the permit to build in the prohibited area without proper notice, they conferred benefit upon the contractor, Starrett, and the Oakleys, at the expense of the Gochmans, thus showing constitutionally barred special treatment to one party over another.

Property

As a result of the construction of the Oakley house, the Gochman property is worth substantially less than as represented. Furthermore, because the protected dune areas

Page 19

provide foundational support of littoral property, any building upon such areas adversely affects the littoral properties, leaving them more susceptible to damage in the case of erosion, storms or severe weather.

## Due Process

The United States Supreme Court has held that "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party, whether unlettered or well-versed in commercial practice, if its name and address are reasonably ascertainable." *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983); *see also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Walker v. City of Hutchinson*, 352 U.S. 112 (1956); *Schroeder v. City of New York*, 371 U.S. 208 (1962); *Greene v. Lindsey*, 456 U.S. 444 (1982). In accordance with such policy, the State of Texas has given littoral owners "aggrieved by a decision of the commissioners court under the [Dune Protection Act]" the right to appeal such decisions. Tex. Nat. Res. Code Ann. § 63.151 (West 1999). From this it follows that because littoral owners have a statutory right to appeal the granting of permits to construct in prohibited areas and thus that their property stands to be adversely affected, such owners have a right to "actual notice [as] a minimum constitutional precondition" to the issuing of such permits.

In the case at hand, it has been established that the Gochman property has been substantially adversely affected by the construction of the Oakley house in the protected dune area. It has also been established that there was no "actual" notification, but only "constructive" notification placed posted at the local city hall of which the Gochmans were understandably unaware. Considering these circumstances and the fact that the

Page 20

Gochmans' names and address was obviously "reasonably ascertainable," it follows that

the Gochmans were deprived of their constitutional right to be notified and to appeal the

issuing of the permit and the construction of the Oakley house.

<u>Equal Protection</u>

The Fourteenth Amendment to the Constitution forbids any State from denying "any

person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §

1. In the case at hand, the issuing of the permit to build on the protected dune area without

proper notice to individuals who may be adversely affected, effectively gives special and

thus unequal protection to those moving in and benefitting from the permits over those

already there, who stand to suffer from the construction. Accordingly, Mr. Starrett and the

Oakleys benefitted from the issuing of the permit at the expense of the Gochmans. The

system in place whereby inadequate notice is being given, unjustly favors contractors

seeking to sell property close to the shore, and adversely affects present littoral owners.

Such practice constitutes unequal treatment and is barred by the Fourteenth Amendment.

<u>Conspiracy</u>

The conspiracy theory can be interpreted in two equally sound ways: The actors

involved, the City of Port Aransas, Mr. Starrett, Urban, and the Oakleys, all acted together

toward the common goal of subverting the Dune Protection Act. Starrett and the Oakleys

both wanted to build the Oakley house in the protected dune area, a violation of the Dune

Protection Act. Urban, acting both as the engineer who filed the application for a permit to

do so and, either actually or effectively, as the city engineer recommending to the City the

approval of the permit, could not have represented the interests of both the people desiring

to be issued the permit and the public policy behind the Dune Protection Act, which are

naturally in conflict with each other. In line with this, the City bodies could not have properly considered the application when supported by its own engineer, an individual with severely conflicted interests. Even though the City knew that Urban was acting on both sides, it accepted the compromised application. Furthermore, as discussed above, proper notice was not issued to those citizens who may have been improperly adversely affected by such conduct. Thus the City illegally ignored the policy and substantive requirements of the Dune Protection Act in collusion with Urban, Mr. Starrett, and the Oakleys. By ignoring the Dune Protection Act, and ignoring the conflict of interest of the city engineer the defendants have accomplished a purportedly legal purpose, issuing the permit, through an illegal means, resulting in the deprivation of the Gochmans' constitutionally protected rights.

Qualified Immunity

The only question to ask is whether the issuing of the permit was "objectively reasonable" in the context of present law. As discussed above, the State of Texas has acknowledged that littoral owners have a special, constitutionally protected, interest in construction upon protected dune areas. Furthermore, the United States Supreme Court has noted that where a property interest stands to be adversely affected, actual notice is required to be served upon the individuals in question. Accordingly, it is objectively unreasonable for a governmental body to issue a permit resulting in the material damage to an individuals' property interest, without proper statutorily required considerations and constitutionally required notice. In this case, the City and the private actors involved both gave inadequate consideration to the permit application and failed to actually notify the Gochmans. In this light, the conduct in question was objectively unreasonable.

Page 22

## CONCLUSION

The Defendants acted together with the common goal of subverting the Dune Protection Act, resulting in the deprivation of plaintiff's right to property, due process, and equal protection. As a result, they have violated 42 U.S.C. 1983, depriving the Gochmans' constitutionally protected rights while acting in a conspiracy under color of law. Defendants have fulfilled all the elements of civil conspiracy and § 1983. Accordingly, summary judgment should be denied.

## PRAYER

Premises considered, Plaintiffs pray that the Motion For Summary Judgment of Urban be, in all things, denied.

Respectfully submitted,

MAX J. LUTHER III, P.C. & ASSOCIATES
1350 Frost Bank Plaza
802 North Carancahua,
Corpus Christi, Texas 78470-0165
Telephone: 361/888-5544
Telecopy: 361/887-6835

By:
MAX J. LUTHER III
Texas Bar Number 12706000
Federal I.D. No. 298

DOW, COGBURN & FRIEDMAN, PC
Edmund L. Cogburn
Texas Bar Number 04501000
Federal I.D. No. 2105
9 Greenway Plaza, Suite 2300
Houston, Texas 77046
Telephone: 713/940-6012
Telecopier: 713/940-6099

ATTORNEYS FOR PLAINTIFFS
Arthur Gochman and Molly Gochman

Page 23

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been served via certified mail, return receipt requested in accordance with the Federal Rules of Civil Procedure to counsel as indicated below on this _____ day of August, 2000.

Ed Cogburn
Dow, Cogburn & Friedman, PC
9 Greenway Plaza, Suite 2300
Houston, TX 77046

Fred D. Dreiling
500 N. Shoreline St., Suite 714
Corpus Christi, TX 78471

James F. McKibben, Jr.
Barger, Hermansen, McKibben
    & Villareal, LLP
2000 North Tower
800 N. Shoreline Blvd.
Corpus Christi, TX 78401

Michael Morris
5350 S. Staples, Suite 222
Corpus Christi, TX 78411

Matthew J. Sullivan
Haynes and Boone, LLP
1600 One American Center
600 Congress Avenue
Austin, TX 78701

E. R. Fleuriet
621 E. Tyler
Harlingen, TX 78550

Jorge C. Rangel
PO Box 2683
Corpus Christi, TX 78403-2683

O:\100\100026\0190\RESUR.MSJ\080920001853